In re Katherine ROMANO; and Domenick Romano, Jr.,
Debtors.

Richard KRONZ and Sylvia Kronz, Plaintiffs,

v.

Alan E. CECH, Trustee of the Estates of Katherine Romano and Domenick Romano, Jr.; Katherine Romano; and Domenick Romano, Jr., Defendants.

Bankruptcy Nos. 93–22401–BM, 90–23246–BM.
Adv. No. 93–2576–BM.

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 6, 1994.

**588**

Phillip S. Simon, Davis Reilly, P.C., Pittsburgh, PA, for plaintiffs Richard Kronz and Sylvia Kronz.

Michael McGreal, Sable, Makoroff & Gusky, P.C., Pittsburgh, PA, for defendants Domenick Romano, Jr. and Katherine Romano.

Alan E. Cech, Chapter 7 Trustee, Flaherty & Associates, P.C., Pittsburgh, PA.

Kathleen Robb–Singer, Office of U.S. Trustee, Pittsburgh, PA.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Several matters are before the court at this time.

Richard Kronz and Sylvia Kronz (the "Kronzes") seek a determination at Adversary No. 93–2576–BM as to the validity, priority, and extent of their mortgage lien against real property located at 406 Cubbage Street and 117 East Mall Plaza in Carnegie, Pennsylvania. Debtors deny that the lien is valid and alternatively have brought a counterclaim in which they seek to avoid the mortgage giving rise to the lien as a preferential transfer. Judgment will be entered in the adversary action in favor of the Kronzes and against debtors.

The Kronzes also have submitted two proofs of claim to which debtors have objected.

The first proof of claim pertains to real properties located on East Main Street in Carnegie, Pennsylvania, which the Kronzes eventually purchased at a sheriff's sale in April of 1994. Debtors assert that the first claim should be disallowed because the Kronzes have been paid in full. The first claim will be allowed in the amount of $36,730.89.

The second proof of claim pertains to properties located on Cubbage Street and East Mall Plaza. Debtors' objection to this claim is based on the same considerations as were raised in response to the complaint in the adversary action. The second claim will be allowed in the amount of $154,401.14.

## I

### FACTS

The major characters in this matter are highly sophisticated business-oriented individuals.

Richard Kronz ("Kronz") is an attorney with experience in real estate transactions and is the husband of Sylvia Kronz.

Domenick Romano is an certified public accountant and a licensed real estate broker who has owned and operated a real estate agency since 1948. He also is a general partner along with his son in Chartiers Valley Travel Service ("CVTS"), a travel agency.

Katherine Romano, the wife of Domenick Romano, owns one hundred percent (100%) of the stock of Lou Gangone, Inc., which operates Ciao's Bar in Carnegie, Pennsylvania, and owns fifty percent (50%) of the stock of Dom et Nick, which operates Wise's Lounge in Crafton, Pennsylvania. Both establishments are under her direction and control.

CVTS was experiencing serious financial problems and had failed to pay European Travel Services ("ETS") and Alitalia Airlines for tours CVTS previously had arranged through them. ETS and Alitalia notified CVTS that they would not honor reservations CVTS had booked for future tours unless CVTS promptly cured arrearages. Debtors were determined to take whatever steps were necessary to ensure that CVTS did not fold.

Debtors owned several parcels of real property. Among the properties they owned were:

(1) a thirty-nine acre farm in Robinson Township, Pennsylvania;

(2) undeveloped land in Elko County, Nevada;

(3) 117 East Mall Plaza, Carnegie, Pennsylvania;

(4) 319 East Main Street, Carnegie, Pennsylvania;

(5) 525 East Main Street, Carnegie, Pennsylvania;

(6) 529 East Main Street, Carnegie, Pennsylvania; and

(7) 406 Cubbage Street, Carnegie, Pennsylvania.

Debtors decided to sell or mortgage some or all of the properties to salvage CVTS.

In May or June of 1990, debtors approached one John Conley ("Conley"), a business acquaintance and creditor of defendant's, and inquired as to whether he might be interested in purchasing the Robinson Township property. The parties dispute whether at that time it was divulged that the property was subject to a mortgage in favor of Lincoln Savings Bank ("Lincoln") in the amount of $150,000.00. Conley informed debtors that he was not interested but did subsequently introduce them to Kronz, who on occasion has served as Conley's attorney.

Kronz met with debtors in late-May or early-June of 1990. Subsequent thereto, Kronz and debtors orally agreed that Kronz and his wife would purchase the Robinson Township and Elko County properties. They further agreed that the closing would take place on July 20, 1990.

On or about July 19, 1990, Conley loaned debtors an additional sum of $100,000.00 for which debtors executed and delivered to Conley two demand notes each in the amount of $50,000.00.

The closing took place as scheduled on July 20, 1990. The warranty deed for the Robinson Township property recited that the consideration paid was $170,000.00. The warranty deed for the Elko County property recited that the consideration paid was $30,000.00.

Debtors executed a $150,000.00 demand note in favor of the Kronzes. As security for the obligation, debtors also executed and delivered a mortgage against the Cubbage Street and East Mall properties. The Cubbage Street property was not encumbered at the time of closing by any liens or mortgage. The East Mall Plaza property was subject to a prior mortgage. Title to the Cubbage Street property was in the name of Katherine Romano only. Domenick Romano had no legal interest in the property.

Kronz informed debtors that he was unable at that time to pay the entire purchase price for the properties. At the closing he paid the sum of $100,000.00 to ETS and debtors jointly and the additional sum of $50,000.00 to debtors.

At the closing, Kronz further proposed purchasing the properties located at 525 and 529 Main Street for the sum of $95,000.00. The proposal called for Kronz to assume the existing mortgages against the properties. The proposal was memorialized in a diary kept by Domenick Romano, which further stated that:

He [Kronz] also stated in writing that he would pay Dom & Kay Romano the sum of $50,00 (sic) that was due on the sale.

On July 26, 1990, Kronz paid an additional $20,000.00 to ETS for the benefit of debtors.

Kronz' proposal to purchase 525 and 529 East Main Street never came to fruition. On July 30, 1990, however, Kronz did lend debtors the sum of $95,000.00. In connection with the loan, debtors executed and delivered to the Kronzes a $100,000.00 demand note and a mortgage in favor of the Kronzes against 319, 525, and 529 East Main Street. That same day, Kronz issued checks payable to ETS and debtors jointly in the amounts of $70,000.00 and $55,000.00, respectively.

The total amount of the payments Kronz made to debtors and/or ETS between July 20, 1990 and July 31, 1991 was $295,000.00. Of that amount, $95,000.00 was for the loan to debtors. The remainder ($30,000.00) was for the Robinson Township and Elko, Nevada properties the Kronzes had purchased.

Kronz filed complaints in confession of judgment on August 10, 1990 in connection with the demand notes debtors had executed on July 20, 1990 and July 31, 1990 and obtained judgments in the amounts stated on the notes. That same day, Kronz recorded the mortgages debtors had executed and delivered on July 20th and July 31st of 1990.

No payments were ever made to the Kronzes in connection with the demand notes debtors had executed.

Debtors filed a voluntary chapter 11 petition on October 19, 1990.

Schedule A-2, Creditors Holding Security, listed the above mortgages held by the Kronzes and characterized them as contingent and possible preferences.

Schedule A-3, Creditors Holding Unsecured Claims Without Priority, listed the Kronzes as having a claim in the amount of $200,000.00 and listed Conley as having a claim in the amount of $200,000.00. Both claims were listed as contingent and possible preferences.

Schedule B-1, Real Property, listed nine properties. The following properties had the following declared values.

| Description of Property | Declared Value |
| --- | --- |
| 406 Cubbage Street | $ 50,000.00 |
| 319 East Main Street | 50,000.00 |
| 525 East Main Street | 80,000.00 |
| 529 East Main Street | 90,000.00 |

Schedule B-3, Personal Property, did **not** list any possible cause of action against the Kronzes for any unpaid balance due and owing in connection with the sale of the Robinson Township and Elko County properties.

Katherine Romano declared a homestead exemption of $7,500.00 in the property located at 406 Cubbage Street on Schedule B-4, Property Claimed as Exempt. The Kronzes' objection to the claimed exemption was sustained on March 21, 1991 as the Cubbage Street property was not Katherine Romano's residence. No appeal was taken from said order.

On March 26, 1991, the Kronzes filed a two-part proof of claim.

The first claim was based on the $100,-000.00 mortgage lien against the three East Main Street properties that debtors had executed on July 31, 1990 and the Kronzes had recorded on August 10, 1990. According to the Kronzes, the value of the properties after prior mortgages are taken into consideration is $136,000.00. The claim is for $100,000.00 in principal, $2,634.43 in pre-petition interest, and $5,000.00 in attorney's fees. The total amount of the claim is $107,634.43.

The second claim was based on the $150,-000.00 mortgage lien against the Cubbage Street and East Mall Plaza properties that debtors had executed on July 20, 1990 and Kronz had recorded on August 10, 1990. According to the Kronzes, the value of the properties after prior mortgages are taken into consideration is $120,000.00. The claim is for $150,000.00 in principal, $4,401.14 in pre-petition interest, and $7,500.00 in attorney's fees. The total amount of the claim is $161,901.14.

On July 16, 1992, Alan E. Cech was appointed as chapter 11 trustee.

On January 19, 1993, the case was converted to a chapter 7 proceeding. The chapter 11 trustee was appointed as chapter 7 trustee on February 1, 1993.

On February 11, 1993, the Kronzes sought relief from the automatic stay and an order authorizing the trustee to abandon the three (3) East Main Street properties. An order was entered on March 31, 1993 over debtors' vigorous objections granting relief from stay effective ninety (90) days from the date of the order.

Katherine Romano filed a motion on March 31, 1993 requesting separate administration of her case.

On April 21, 1993, the trustee filed a motion requesting permission to sell 406 Cubbage Street free and clear of all liens and encumbrances. The Kronzes were the only named respondents. The only lien or encumbrance listed in the motion was the Kronzes' $150,000.00 mortgage lien.

An order was entered on May 21, 1993 confirming sale of the property for $53,-000.00. The order approving the sale contained the following provision:

The Liens of the Respondents shall be and they hereby are transferred to the proceeds of the sale, subject to any future determination as to the nature, extent, priority or validity of said liens, and said sale shall be free and clear of all listed liens and encumbrances.

An order approving a settlement agreement between the chapter 7 trustee and debtors was entered on July 1, 1993 over the strenuous objection of the Kronzes, who did not appeal the order. Among other things, the agreement provided that Katherine Romano's motion for separate administration was granted. The agreement further provided as follows:

B. The assets described below are transferred solely to the estate of Katherine Romano and shall not be available for distribution to the creditors of Domenick Romano, individually.

(1) one-half of the proceeds of the sale of 406 Cubbage Street, after deduction for costs of sale, including Trustee's commission and attorney's fees, broker's fees, transfer taxes, etc.; ...

C. The assets described below are transferred solely to the estate of Domenick Romano and shall be available for distribution to the creditors of both Domenick and Katherine Romano, whether jointly or severally.

(1) one-half of the proceeds of the sale of 406 Cubbage Street, after deduction for costs of sale, including Trustee's commission and attorney's fees, broker's fees, transfer taxes, etc.;

(G) Richard and Sylvia Kronz shall retain their existing mortgage liens on the debtors' property as collateral for the specific debts secured thereby. Richard and Sylvia Kronz agree to look for payment first to their collateral and the estate of Domenick Romano. Only after those assets have been exhausted may Richard and Sylvia Kronz pursue any deficiency against the estate of Katherine Romano.

An order was entered on November 24, 1993 granting the trustee permission to abandon the three East Main Street properties. The Kronzes subsequently became mortgagees-in-possession. Between November of 1993 and April 8, 1994, the Kronzes collected $12,497.50 in rents and incurred expenses of $8,177.43 in connection with the properties.

On December 14, 1993, the Kronzes commenced the above-captioned adversary action to determine the validity, priority, and extent of their lien against the sale proceeds realized from the sale of 406 Cubbage Street. They allege in the complaint that there are no liens prior to their recorded lien and seek an order determining that they have a valid, first priority lien on the sale proceeds and directing the trustee to pay the net proceeds to them.

Debtors answered the complaint and brought a counterclaim on January 21, 1994. In their answer, debtors assert that the lien is invalid because no consideration was given for the $150,000.00 note and mortgage executed on July 20, 1990. They further assert that, pursuant to the settlement agreement approved on July 1, 1993, Katherine Romano personally is entitled to receive fifty percent (50%) of the net sale proceeds. In their counterclaim, debtors assert that the lien of the Kronzes is avoidable as a preference pursuant to § 547(b) of the Bankruptcy Code.

The Kronzes assert in their response to the counterclaim that the preference action is time-barred; that debtors lack "standing" to bring such an action; that debtors are judicially estopped from asserting that Katherine Romano was insolvent at the time of the transfer; that certain required elements of a preference action are lacking; and that the transfer in question was a contemporaneous exchange for value.

On March 22, 1994, an order was issued granting the trustee permission to abandon any interest debtors' estates had in the Robinson Township property.

Debtors objected to the Kronzes' proof(s) of claim on May 16, 1994. They assert that the first claim pertaining to the $100,000.00 mortgage against the three East Main Street properties should be disallowed because the claim has been paid in full. According to debtors, the rentals the Kronzes received from the properties plus the value of the

properties exceeds $100,000.00. Their objection to the second claim pertaining to the $150,000.00 mortgage against 406 Cubbage Street and 117 East Mall Plaza is based on the reasons set forth in their answer and counterclaim to Adversary No. 93–2576–BM.

Debtors were granted discharges on June 8, 1994.

Trial was held on the Kronzes' complaint and debtors' counterclaim at Adversary No. 93–2576–BM and on debtors' objections to the Kronzes' proofs of claim. All parties were given an opportunity to present evidence on the issues before the court.

## II

## ANALYSIS

### A) *ADVERSARY NO. 93–2576–BM*

The Kronzes allege that there are no liens prior to their recorded mortgage and seek an order determining that they have a valid, first priority lien against the sale proceeds of 406 Cubbage Street.

■ Debtor's respond that the lien is invalid because the mortgage they executed and delivered on July 20, 1990 was given without consideration. Their response is without merit for several reasons.

According to debtors, the Kronzes had agreed orally to purchase the Robinson Township and Elko County properties for $675,000.00 in cash and had agreed to assume the $150,000.00 mortgage against the Robinson Township property held by Lincoln. They further assert that Kronz, who was fully aware of and unscrupulously exploited their financial plight, unilaterally altered key provisions of the agreement of sale at the closing.

Kronz, debtors assert, insisted for the first time at the closing that a debt of $230,000.00 which they owed to Conley would be part of the purchase price. In addition, Kronz gratuitously required debtors to execute a $150,-000.00 demand note and a mortgage against the Cubbage Street and East Mall Plaza properties. Because of their desperation, debtors continue, they involuntarily executed and delivered the demand note and mortgage even though they bore no relationship to the agreement of sale or the purchase price. Debtors further allege that Kronz paid them only $150,000.00 in cash at the closing and another $145,000.00 of the purchase price by July 31, 1990 and claim that the outstanding cash balance of the purchase price was never paid.

Debtors' account of the sale and surrounding events and circumstances is not credible. As noted, debtors are experienced and sophisticated individuals who possess considerable business acumen. Domenick Romano is an certified public accountant and licensed real estate broker and has owned and operated a real estate agency since 1948. Katherine Romano owns and operates two businesses. Their depiction of themselves as tyros or greenhorns whom Kronz bullied at the closing into doing as he insisted was unconvincing.

The court had an opportunity to observe debtors when they testified and is convinced that, had Kronz unilaterally changed at the closing the terms of the agreement of sale as they claim he did, debtors, would **not** have meekly acquiesced but instead would have rejected his demands. In particular, debtors would not have executed the $150,000.00 demand note and mortgage and would not have agreed to include the debt they owed to Conley as part of the purchase price unless they previously had so agreed.

Debtors' experience and demeanor are not the only factors which belie their version of what transpired. Their concomitant assertion that the $150,000.00 note and mortgage were gratuitous "add ons" Kronz forced upon them at the closing is unconvincing. Domenick's note to himself in his diary shortly after the closing wherein he chronicles the fact that only $50,000.00 was due and owing contradicts debtors' present position.

Additionally, if debtors' story is true, a substantial portion of the purchase price was never paid by the Kronzes. According to debtors, the Kronzes paid only $295,000.00 of the agreed-upon purchase price of $675,-000.00. The schedules debtors submitted shortly after filing their bankruptcy petition in October of 1990, just three months after the closing took place, give no indication that

the Kronzes owed them any money. In particular, debtors did not indicate any potential cause of action against the Kronzes. This "omission" compels the conclusion that debtors' version of events is inaccurate. Considering the amount of the unpaid balance and the near proximity of the closing to the filing of the chapter 11 petition, any suggestion that this was due to an oversight rings hollow.

The Kronzes' version of events is more credible.

Debtors and the Kronzes had agreed that the Kronzes would purchase the Robinson Township and Elko County properties for the sum of $430,000.00 and that forgiveness of the $230,000.00 debt which debtors owed to Conley would constitute a portion of the purchase price. This price was based in large part on debtors' representation to the Kronzes that the Robinson Township property was not encumbered by any liens. The original agreement of sale did not contemplate that debtors would execute a $150,-000.00 note and mortgage.

Debtors' representation that the Robinson Township property was not encumbered by any liens was untrue. Kronz discovered shortly before the scheduled closing that the property was subject to a mortgage in favor of Lincoln in the amount of $150,000.00 and advised debtors at the closing that he would apply $150,000.00 of the purchase price to satisfy the mortgage. Debtors, who were in need of cash with which to bail out CVTS, reluctantly agreed as an alternative to execute a $150,000.00 note and a mortgage against the Cubbage Street and East Mall Plaza properties.

The cash balance due and owing after forgiveness of the debt owed to Conley by debtors was $200,000.00. The Kronzes paid the sum of $150,000.00 on July 20, 1990 and the remaining balance of $50,000.00 by July 31, 1990.

The note and mortgage were given for consideration. In exchange for debtors executing the note and mortgage, the Kronzes suffered the "detriment" of taking title to the Robinson Township property subject to the prior lien of Lincoln instead of taking it free and clear of all pre-existing encumbrances.

▮ Debtors' assertion that the lien is invalid because the mortgage was not supported by consideration would fail even if the above consideration did not exist.

Section 6 of the Statute of Frauds,[1] also known as the Uniform Written Obligations Act, provides that a written agreement may not be avoided for lack of consideration if the agreement contains a provision wherein the parties express their intention to be legally bound nonetheless. *See Laudig v. Laudig,* 425 Pa.Super. 228, 235, 624 A.2d 651, 654 (1993).

The mortgage debtors executed on July 20, 1990 contained the following language:

> The covenants, conditions and agreements contained in this Mortgage shall bind, and the benefits thereof shall inure to the respective parties hereto and their respective heirs, executors, administrators, successors and assigns as the case may be. If this Mortgage is executed by more than one person, the undertakings and liability of each shall be joint and several.

The language of this provision unequivocally expresses debtors' intention to abide by the terms and provisions of the mortgage, including their "agreement" to grant the Kronzes a mortgage against the Cubbage Street and East Mall Plaza properties.

Now that we have determined that the Kronzes' mortgage is valid, we next must ascertain the priority and extent of the lien arising therefrom.

Mortgages (other then purchase money mortgages) and defeasible deeds in the nature of mortgages have priority over one another "from the time they are left for record". 42 Pa.C.S.A. § 8141(2) (Purdon's 1982).

---

1. 33 P.S. Section (Purdon's 1967) provides in relevant part that:

   A written ... promise, hereafter made and signed by the person ... promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement, in any form of language, that the signer intends to be legally bound.

The mortgage of July 20, 1990 was duly recorded by Kronz in accordance with Pennsylvania law. No other mortgage pertaining to 406 Cubbage Street had been "left for record" prior to August 10, 1990. The property was not encumbered by any other unsatisfied mortgage or other kind of lien at that time. Accordingly, the lien had first priority when the bankruptcy petition was filed on October 18, 1990.

█ In their answer to the Kronzes' complaint, debtors deny that the Kronzes' lien takes priority over all other claims to the sale proceeds. According to debtors, fifty percent (50%) of the sale proceeds belong to Katherine Romano personally (as opposed to her estate) by virtue of the settlement agreement approved on July 1, 1993.

This assertion is without merit. The settlement agreement does **not** provide that fifty percent (50%) of the proceeds from the sale of 406 Cubbage Street belong to Katherine Romano personally (as opposed to her estate, of which Kronz is a creditor). The agreement provided that fifty percent (50%) of the sale proceeds was transferred to the **estate** of Katherine and were not available for distribution "to the creditors of Domenick Romano, individually". The remaining fifty percent (50%) was transferred to the estate of Domenick Romano and were available for distribution to "creditors of both Domenick and Katherine Romano, whether jointly or severally".

Moreover, the settlement agreement, to which the Kronzes had not consented, expressly provided that the Kronzes retained their existing mortgage liens on debtors' properties. It further provided that the Kronzes had to look for payment first to the estate of Domenick Romano and had to exhaust those assets before they could seek distribution from the estate of Katherine Romano. It is clear that the Kronzes never agreed to this restriction and that they cannot be satisfied from the assets of the estate of Domenick Romano. As creditors of Katherine Romano, they clearly can pursue this source.

In light of the foregoing, it must be concluded that the Kronzes' mortgage lien entitles them to the net proceeds realized from the sale of 406 Cubbage Street, unless debtors prevail on the preference action asserted in their counterclaim.

## B) *DEBTORS' COUNTERCLAIM*

Debtors assert in their counterclaim that the mortgage executed on July 20, 1990 in favor of the Kronzes constitutes an avoidable preference pursuant to § 547(b) of the Code.

█ The following must be established in order for the party bringing a preference avoidance action under § 547(b) to prevail:

(1) a transfer of debtor's property occurred;

(2) to or for the benefit of a creditor;

(3) for or on account of an antecedent debt owed by debtor before the transfer occurred;

(4) made while the debtor was insolvent;

(5) made on or within ninety days before the filing of the bankruptcy petition, or within one year if the creditor is an insider; and

(6) the transfer enabled the creditor to receive more than it would if:

(A) the case had been brought under chapter 7;

(B) the transfer had not occurred; and

(C) the creditor received payment to the extent provided for under the Code.

*See In re Allegheny Label, Inc.*, 128 B.R. 947, 951 (Bankr.W.D.Pa.1991). The party bringing the avoidance action has the burden of proving these elements by a preponderance of the evidence. *Id.*

The Kronzes have responded to the counterclaim with the following defenses and objections:

(1) the counterclaim is time-barred by § 546(a)(1) of the Code;

(2) debtors lack "standing" as chapter 7 debtors to bring a preference action;

(3) elements (2), (4), and (6) of a preference avoidance action are lacking; and

(4) the transfer was a "contemporaneous exchange for new value" pursuant to § 547(c)(1).

We shall consider these objections *ad seriatim.*

### i) *Is The Counterclaim Time–Barred?*

■ Debtors commenced the above bankruptcy proceeding on October 18, 1990. Alan E. Cech was appointed as chapter 11 trustee pursuant to § 1104 on July 16, 1992, nearly twenty-one (21) months later. He then was appointed chapter 7 trustee pursuant to § 702 on January 19, 1993, some twenty-seven (27) months after debtors filed their chapter 11 petition. On February 7, 1994, more than three (3) years after the filing of the chapter 11 petition but less than two (2) years after appointment of the chapter 11 trustee and slightly more than one (1) year after appointment of the chapter 7 trustee, debtors brought their preference action as a counterclaim.

Section 546 of the Code sets various limitations on the trustee's avoidance powers. It provides in relevant part as follows:

(A) An action or proceeding under section … 547 … of this title may not be commenced after the earlier of—

(1) two years after the appointment of a trustee under section 702, 1104, 1163, 1302, or 1202 of this title; and

(2) the time the case is closed.

11 U.S.C. § 546.

The Kronzes contend that debtors' counterclaim is barred as untimely by § 546(a)(1) in light of the recent decision in *In re Coastal Group*, 13 F.3d 81 (3d Cir.1994).

The issue addressed in *Coastal Group* was whether § 546(a)(1) applies to debtors-in-possession or only to trustees. *Id.* at 82. The court of appeals held that it also applies to debtors-in-possession. *Id.* at 86.

The present case is not on "all fours" with *Coastal Group* but differs from it in certain respects. For instance, a chapter 11 and then a chapter 7 trustee have been appointed in this case. The Kronzes have called upon us to predict what the court of appeals would hold in this case. We obviously are not prescient and can only make a "best guess" as to the application of *Coastal Group* to the present case.

We believe that the court of appeals would hold that if debtors were bringing their preference avoidance action as an **affirmative** cause then it is time-barred. The court of appeals would reject debtors' argument that they "stand in the shoes" of the chapter 7 trustee as impermissible bootstrapping. The two year statute of limitations has passed and the trustee has expressly refused to bring this adversary.

This, however, is not the end of the matter. We also believe that the court of appeals would recognize that debtors' counterclaim is a defensive rather than an affirmative action and is not time-barred because it is in the nature of a recoupment.

■ Equitable recoupment permits a party to assert a defense which could not be asserted affirmatively as a counterclaim because the statute of limitations has run. Such a defense is not barred by the statute of limitations so long as the main action brought by plaintiff is timely. *See Bull v. U.S.*, 295 U.S. 247, 260–61, 55 S.Ct. 695, 699–701, 79 L.Ed. 1421 (1935).

■ Recoupment is the "setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action for the purpose of abatement or reduction of such claim". *In re University Medical Center,* 973 F.2d 1065, 1079 (3d Cir.1992). In order for recoupment to apply in a bankruptcy case, the opposing claims "must arise out of the same integrated transaction" so that it would be inequitable for one party to enjoy the benefits of that transaction while depriving the other party of the same opportunity. *Id.* at 1081.

Debtors in the present case must show the following to maintain a claim for recoupment:

(1) the Kronzes' claim and their claim are products of the same transaction;

(2) the claim is asserted as a defense to the Kronzes' claim; and

(3) the Kronzes' action was timely.

*See In re Woolaghan,* 140 B.R. 377, 383 (Bankr.W.D.Pa.1992).

Each of these requirements is satisfied in this instance.

Debtors' preference avoidance action and the Kronzes' action to determine the validity, extent, and priority of their mortgage lien against 406 Cubbage Street arise out of a single, integrated transaction. The mortgage lien the Kronzes seek to have affirmed is the very lien the Kronzes seek to avoid.

Furthermore, although a preference action perhaps is brought in most situations as an affirmative rather than a defensive matter, in this instance it is defensive in nature. Debtors seek to abate the very lien the Kronzes seek to enforce by attempting to avoid it as a preference.

Finally, the underlying action the Kronzes have brought is obviously timely. Nobody suggests that it is untimely.

We believe that the court of appeals would construe debtors' counterclaim as a defensive action in the nature of a recoupment and would hold that it is not barred as untimely by § 546(a)(1).

### ii) *Do Debtors Have Standing To Bring An Avoidance Action?*

■ The Kronzes next argue that debtors lack "standing" as chapter 7 debtors to bring this avoidance action. They concede that debtors may do so under limited circumstances but deny that all of the requirements for them to do so have been met in this instance.

The language of 11 U.S.C. § 547, which was previously set forth at length, provides only that the trustee may avoid certain transfers. It does not speak of debtors, in particular of chapter 7 debtors.

■ The general rule is that the chapter 7 trustee is the representative of the bankruptcy estate and, as such, is the only person who may bring a preference avoidance action.

Like so many other legal generalizations, this principle has its exceptions. A chapter 7 debtor may assert the trustee's avoidance powers by way of § 522 of the Code, which provides in relevant part that:

(h) The debtor may avoid a transfer of property of the debtor ... to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if—

(1) such transfer is avoidable by the trustee under section ... 547 ... of this title ... and

(2) the trustee does not attempt to avoid such transfer.

11 U.S.C. § 522.

Subsection (g)(1), which is referred to in subsection (h), states in relevant part that:

(g) ... [T]he debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if—

(1)(A) such transfer was not a voluntary transfer of such property by the debtor; and

(B) the debtor did not conceal such property; ...

11 U.S.C. § 522.

■ A chapter 7 debtor must satisfy the following requirements before exercising the trustee's avoidance powers:

(1) the trustee must not have sought and must not seek to avoid the transfer;

(2) the trustee must have the ability to avoid the transfer;

(3) the transfer debtor seeks to avoid must be involuntary and the property must not have been concealed; and

(4) the property debtor seeks to recover must be exemptible.

*See In re Wimbish,* 95 B.R. 379, 386 (Bankr. W.D.Pa.1989).

The first of these requirements has been met in this case. The chapter 7 trustee has not brought a preference action against the Kronzes and stated under oath at trial that he had no intention of so doing.

The second requirement also has been met. Section 546 of the Code sets various limitations upon the trustee's powers of avoidance. The chapter 7 trustee would not be barred by § 546(a)(1) from bringing a

preference action against the Kronzes, if he so chose. The court is aware of no other limitations or infirmities—and the Kronzes have pointed to none—that would prevent the chapter 7 trustee from exercising the power to bring a preference action against the Kronzes.

The third requirement is the most difficult to determine.

Debtors did not conceal their interest in the Cubbage Street and East Mall Plaza properties. The question that must be resolved is whether the transfer regarding those properties was "involuntary" in the requisite manner.

Debtors naturally insist that the mortgage which they executed in favor of the Kronzes was "involuntary". They claim that Kronz was cognizant of the serious financial plight of CVTS and of their desperate need for at least $100,000.00. They aver he used this knowledge to his advantage.

According to debtors, Kronz informed them for the first time at the closing that he would not pay them $150,000.00 in cash at that time unless they executed the $150,-000.00 demand note and mortgage against the Cubbage Street and East Mall Plaza properties. They insist that they were "absolutely crushed" by the economic pressure Kronz placed on them and the mortgage was an involuntary transfer in that it occurred on account of the "business compulsion" Kronz created and orchestrated. Their contention is without merit.

To begin with, it is highly doubtful that the transfer represented by the mortgage would qualify as "involuntary" in the requisite sense even if debtors' account of events were entirely accurate. The Code does not define what is meant by "involuntary" in this context. The legislative history, however, strongly suggests that a mortgage lien does not so qualify:

> Subsection (g) gives the debtor the ability to exempt property that the trustee recovers under one of the trustee's avoiding powers if the property was involuntarily transferred away from the debtor (such as by the fixing of a judicial lien) and if the debtor did not conceal the property . . . .

H.R.Rep. No. 595, 95th Cong., 1st Sess. 362 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 76 (1978).

A judicial lien differs from a mortgage lien in that the former arises without any affirmative action required by the debtor. A mortgage lien, on the other hand, would seem to require some sort of affirmative action by the debtor before such a lien can arise.

It fortunately is not necessary to resolve this issue here. Even if a mortgage in theory can rise to the level of an "involuntary" lien, the circumstances of this case indicate that the lien in reality was voluntary.

Execution of the mortgage on July 20, 1990 was but a single event or occurrence and was an integral part of a larger, complex transaction which culminated in the Kronzes' paying debtors $200,000.00 in cash and in return receiving title to the Robinson Township and Elko County properties.

We must look to the transaction as a whole to determine whether a particular required action or event that occurred within the confines of the entire transaction was voluntary or not. *See In re Ricke*, 84 B.R. 408, 409 (Bankr.W.D.Pa.1988). If certain actions are necessary or required to complete or consummate a larger transaction, those actions are not thereby "involuntary", provided that the debtor voluntarily chose to undertake the larger transaction. *Id.* For instance, if a debtor has control over whether or not to sell their property and the debtor is required as a consequence to pay off existing liens and taxes and to pay closing costs in order to deliver clear title, it does not follow that payment of these items is "involuntary in the requisite manner. *Id.* To the contrary, if undertaking the larger transaction was within the debtor's control, any actions undertaken in consummating that transaction—even actions the debtor is loathe to take—must be regarded as voluntary. *Id.*

Application of this standard of the facts of this case compels the conclusion that the mortgage debtors executed on July 20, 1990 was entirely voluntary. The decision to sell the Robinson Township and Elko County properties remained at all times under debtors' control.

598

The dire financial plight of CVTS notwithstanding, debtors had the final say in whether or not to go forward with the sale. While it may or may not be the case that the Kronzes would have backed out at the last moment had debtors refused to execute the mortgage at the closing, debtors ultimately controlled whether they would consummate the sale.

Debtors' depiction of their dealings with the Kronzes as a one-sided relationship in which the Kronzes overpowered debtors' will and forced them to consummate the sale is unconvincing. As was indicated, debtors were sophisticated individuals with considerable business experience. They were more than capable of refusing to go forward with the deal if they thought the terms and conditions were too onerous.

Finally, debtors' reliance upon the doctrine of economic distress in this instance is misplaced.

■■■ The doctrine of economic distress is based upon the following critical elements:

(1) existing circumstances compelled the injured party to involuntarily or unwillingly execute an agreement which resulted in economic loss; and

(2) the injured party had no immediate legal remedy.

*See Litten v. Jonathan Logan, Inc.*, 220 Pa.Super. 274, 282, 286 A.2d 913, 917 (1971).

■■■ A highly relevant factor in determining whether economic distress has occurred is whether the party exerting pressure has contributed to the other's financial distress. *See Seal v. Riverside Federal Savings Bank*, 825 F.Supp. 686, 695 (E.D.Pa.1993).

The Kronzes did not contribute to the financial distress debtors experienced in July of 1990. It was due to problems CVTS was having at that time with ETS and Alitalia. The contention that Kronz was somehow responsible for their financial plight is specious. To the contrary, Kronz thought they were buying unencumbered real estate and only later learned that it was burdened with the $150,000.00 Lincoln mortgage. The worst that can be said of Kronz is that he exploited debtors' predicament and obtained an advantageous deal at debtors' expense. In point of fact, he appears only to be covering the undisclosed $150,000.00 Lincoln mortgage shortfall. This is a far cry from saying that the mortgage was involuntary because debtors were under economic distress.

It is not necessary in light of this last determination to consider whether the property that debtors seek to avoid is exemptible. The finding that the mortgage was not an involuntary transfer—i.e., was voluntary—compels the conclusion that debtors may not bring the preference avoidance action stated in their counterclaim.

Even though it is not necessary to do so in light of the determination that debtors lack "standing", a few words concerning debtors' preference action are in order.

■■■ Section 547(b) serves various purposes. It is designed to promote equality of distribution among creditors by assuring that all similarly situated creditors receive their **pro rata** share of debtor's estate. Also, it is designed to reduce creditors' incentive to rush to dismember a financially distressed debtor by providing for recapture of last-minute payments. *See Matter of Smith*, 966 F.2d 1527, 1535 (7th Cir.1992), *cert. dismissed, Baker & Schultz, Inc. v. Boyer*, —— U.S. ——, 113 S.Ct. 683, 121 L.Ed.2d 604 (1993).

The first of these purposes has been described as the "ultimate" or "most important" purpose of § 547(b). *See In re Perma Pacific Properties, Inc.*, 983 F.2d 964, 969 (10th Cir.1992); *In re Antweil*, 931 F.2d 689 (10th Cir.1991), *affirmed*, —— U.S. ——, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992).

Another stated purpose of § 547(b) is to discourage "secret liens" against a debtor's property which are not perfected until just before debtor files for bankruptcy, as other creditors might extend credit on the assumption that the property was free and clear. *See, In re Gulino*, 779 F.2d 546, 549 (9th Cir.1985) (*citing In re Arnett*, 731 F.2d 358, 363 (6th Cir.1984).

The overwhelming preponderance of the debt owed to creditors in these cases is owed by the estate of Domenick Romano. Katherine Romano was not a principal of CVTS,

as was Domenick Romano. Aside from the debt owed to the Kronzes, the estate of Katherine Romano has few creditors.

If debtors prevailed on their counterclaim, none of the above-stated purposes of § 547(b) would be served or effectuated in Katherine Romano's case. Any recovery by debtors would inure primarily, if not entirely, to the benefit of Katherine Romano, and would not benefit her creditors much, if at all. Because Katherine Romano had few creditors, there was no need in her case to discourage her creditors from rushing to "dismember" her. Moreover, the lien arising from the mortgage debtors executed in favor of the Kronzes was not a "secret lien". The Kronzes recorded the mortgage some three weeks after it was executed. Because the mortgage was "of record", potential creditors (if any) had ample notice thereof.

## C) *OBJECTION TO PROOFS OF CLAIM*

### i) *Second Proof Of Claim.*

Because the issues surrounding the second proof of claim basically are identical to the issues raised in connection with the above adversary action, we will consider the second proof of claim and debtors' objection thereto before turning to the first proof of claim.

The burden of proof for a claim brought pursuant to 11 U.S.C. § 502 "rests on different parties at different times". *In re Allegheny International, Inc.*, 954 F.2d 167, 173 (3d Cir.1992).

■ The initial burden is upon the claimant to allege facts sufficient to support the claim. If the claimant does so, the proof of claim is *prima facie* valid. *Id.*

■ At that point, the burden then shifts to the objector to come forward with evidence negating the *prima facie* validity of the claim. The evidence presented must be "equal in force" to the *prima facie* case. *Id.*

■ Although the burden of proof may shift back and forth in this manner, the

ultimate burden of persuasion remains at all times with the claimant. *Id.*

The second proof of claim is based on the $150,000.00 mortgage executed on July 20, 1990 and recorded on August 10, 1990. The total amount of the proof of claim is $154,-401.14. In addition to the unpaid principal balance of $150,000.00, the proof of claim includes pre-petition interest in the amount of $4,401.14.[2]

The second proof of claim is *prima facie* valid. The facts alleged therein are sufficient to support entitlement to the amount requested.

The mortgage upon which the second proof of claim is based contains a provision that the amount due and owing also includes interest at the rate provided in the note debtors executed when they executed the mortgage. The note specifically provides for interest at the rate of twelve percent (12%) *per annum*. The amount of interest that had accrued under this provision by the filing of the bankruptcy petition on October 19, 1990 is slightly less than $4,500.00. The Kronzes claim that the exact amount is $4,401.14. Debtors do not dispute that the documents called for interest or that the amount of pre-petition interest is $4,401.14.

Debtors' objection to the second proof of claim is based on the same considerations as were raised in response to the complaint in the above adversary action. No new or additional objections were raised.

We previously determined that these objections are unfounded and without merit. Accordingly, the Kronzes' second proof of claim will be allowed in the amount of $154,-401.14. Included in this amount are the net sale proceeds of 406 Cubbage Street, which the trustee shall retain until final distribution is made to all creditors.

### ii) *First Proof Of Claim.*

The first proof of claim is based on the mortgage debtors executed on July 31, 1990 and the Kronzes recorded on August 10, 1990.

---

**2.** This proof of claim, as originally filed, also included $7,500.00 in attorney's fees. The post-trial brief of the Kronzes indicates that they have abandoned the request for attorney's fees, as no mention is made therein of attorney's fees.

The original claim, which was filed on March 26, 1991, was in the amount of $107,-638.43. In addition to an alleged unpaid balance of $100,000.00, the Kronzes sought $2,638.43 in pre-petition interest and $5,000.00 in attorney's fees.

Subsequent to the filing of the proof of claim, the Kronzes took possession of the East Main Street properties as mortgagees-in-possession. During that time, they collected rents in the amount of $12,497.50 and incurred expenses in the amount of $8,127.43. The net gain realized by the Kronzes during their tenure as mortgagees-in-possession was $4,320.07 ($12,497.50 − $8,177.43 = $4,320.07).

The Kronzes ultimately obtained judgments in foreclosure against the East Main Street properties and purchased them on April 4, 1994 at a sheriff's sale for $4,347.68, the amount of the costs incurred in executing against the properties.

The Kronzes purchased the properties subject to prior mortgages against two of the properties in the amount of $91,121.41 and satisfied prior tax liens in the amount of $4,943.44.

The total amount of prior mortgage liens, tax liens, and the purchase price of the properties was $100,412.53 ($91,121.41 + $4,943.44 + $4347.68 = $100,412.53).

■■■ Under the Deficiency Judgment Act, a creditor's judgment against a debtor must be reduced by the fair market value of the property rather than by the sale price paid for the property. *See* 42 Pa.C.S.A. § 8103(c). If the creditor fails to bring a timely petition to fix the fair market value of the property, the judgment in favor of the creditor is deemed to be satisfied as a matter of law. *See* 42 Pa.C.S.A. § 8103(d). These provisions apply when a judgment creditor purchases a debtor's real estate at sheriff's sale and fails to petition the court to fix the fair market value of the realty within the statutorily prescribed time frame. *See First National Consumer Discount Co. v. Fetherman,* 515 Pa. 85, 95, 527 A.2d 100, 105 (1987).

Although the Kronzes have not brought such a petition, in this court or in any other, the parties obviously desire to have the first proof of claim determined in accordance with the provisions of the Deficiency Judgment Act.

■■■ Debtors do not contest the validity of the first proof of claim as they contested the second one. They instead maintain that it should be disallowed in its entirety because the Kronzes already have been paid in full. According to debtors, the profits the Kronzes realized as mortgagees-in-possession coupled with the difference between the fair market values of the East Main Street properties and the above "charges" against the properties exceeds the amount of the claim. Debtors contend that the properties have the following values:

| Description Of Property | Value of Property |
|---|---|
| 319 East Main Street | $ 48,000.00 |
| 525 East Main Street | 82,000.00 |
| 529 East Main Street | 68,000.00 |
| TOTAL | $198,000.00 |

The Kronzes do not seek the full amount asserted in the proof of claim they filed on March 26, 1991. They concede that the net value realized during their tenure as mortgagees-in-possession and as a result of their purchasing the properties should be taken into account and deducted from their claim. However, they deny that the claim already has been satisfied in full. According to the Kronzes, the East Main Street properties have the following fair market value:

| Description of Property | Fair Market Value |
|---|---|
| 319 East Main Street | $ 24,000.00 |
| 525 East Main Street | 73,000.00 |
| 529 East Main Street | 60,000.00 |
| TOTAL | $157,000.00 |

Both sides called expert witnesses to testify concerning the fair market values of the properties. Each utilized the market data approach and the income approach in arriving at their respective values for the properties. Except for the property located at 319 East Main Street, their estimates as to value are not widely divergent.

Although both witnesses were qualified to offer expert testimony, the testimony offered by the Kronzes' witness that the properties have an aggregate fair market value of $157,-000.00 was more persuasive than the testimony offered by debtors' witness that they have a fair market value of $198,000.00. The Kronzes' witness was better able than was

debtors' witness to explain and justify the variables upon which he relied. The court is convinced after examining photographs of the properties which were offered into evidence that a willing arm's-length buyer would not agree to pay what debtors claim the properties are worth.

Also, the Kronzes have placed 319 East Main Street on the market for sale and are asking $37,500.00. Lesser offers would be considered. Offers higher than the asking price are rarely forthcoming. If debtors were correct as to the value of this property, the Kronzes would be willing to sell the property at nearly twenty-five percent (25%) below its market value. Considering that Richard Kronz has no financial need for a quick sale, coupled with his considerable experience in real estate matters, it is unlikely that he would be willing to sell the property at such a discount. It is far more likely that the property is worth approximately $24,000.00.

The aggregate value of the East Main Street properties plus the profits the Kronzes realized while they were mortgagees-in-possession is $161,320.07 ($157,000.00 + $4,320.07 = $161,320.07).

The difference between this amount and the above "charges" against the properties is $60,907.54 ($161,320.07 − $100,412.53 = $60,907.54). This amount represents the net value the Kronzes already have realized in connection with the first proof of claim.

The allowable amount of the Kronzes' first proof of claim, exclusive of the amounts they already have received, is $97,638.43.

The unpaid principal amount due and owing is $95,000.00, not $100,000.00 as the Kronzes claim. On July 31, 1990, the Kronzes loaned debtors $95,000.00. Richard Kronz conceded as much and testified under oath that he added an additional $5,000.00 to the principal amount of the note and mortgage because of the "aggravation" he endured in having to talk to Katherine Romano and debtors' attorney. The mortgage executed on July 31, 1990 provided that the amount due and owing included interest at the rate provided for in the note debtors executed when they executed the mortgage—

i.e., twelve percent (12%). Debtors do not dispute that the amount of pre-petition interest due and owing on this loan is $2,638.43.

The Kronzes also requested in the first proof of claim an additional $5,000.00 in attorney's fees. The documents evidencing the obligation make no provision for attorney's fees. Accordingly, they are not allowable in this instance.

The remaining allowable amount of the first proof of claim is $36,725.89, which is the difference between the allowable total amount of the first proof of claim and the net value the Kronzes already realized in connection with the claim ($97,638.43 − $60,907.54 = $36,730.89).

An appropriate order shall be issued.